[Cite as *State v. Brandon*, 2016-Ohio-271.]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| | | JUDGES: |
| STATE OF OHIO | : | Hon. Sheila G. Farmer, P.J. |
| | : | Hon. W. Scott Gwin, J. |
| Plaintiff-Appellant | : | Hon. William B. Hoffman, J. |
| | : | |
| -vs- | : | |
| | : | Case No. CT2015-0039 |
| RONALD J. BRANDON | : | |
| | : | |
| Defendant-Appellee | : | O P I N I O N |


CHARACTER OF PROCEEDING:            Criminal appeal from the Muskingum
                                    County Court of Common Pleas, Case No.
                                    CR2014-0075


JUDGMENT:                           Reversed and Remanded


DATE OF JUDGMENT ENTRY:             January 25, 2016


APPEARANCES:

For Plaintiff-Appellee              For Defendant-Appellant

D. MICHAEL HADDOX                   JOHN WEAVER
Muskingum County Prosecutor         542 S. Drexel Ave.
27 N. Fifth St.                     Bexley, OH 43209
Box 189
Zanesville, OH  43702

*Gwin, P.J.*

{¶1}   Defendant-appellant Ronald Brandon ["Brandon"] appeals his conviction and sentence from the Muskingum County Court of Common Pleas on one count of possession of drugs. Plaintiff-appellee is the State of Ohio.

*Facts and Procedural History*

{¶2}    On March 5, 2014, the Muskingum County Grand Jury indicted Brandon on one count of possession of drugs (cocaine) in violation of R.C. 2925.11(A), a felony of the fourth degree, and one count of possession of drugs (marijuana) in violation of R.C. 2925.11(A), a minor misdemeanor. At his arraignment on March 26, 2014, Brandon entered a plea of not guilty to the charges.

{¶3}   On May 22, 2014, Brandon filed a Motion to Suppress Evidence. Brandon, in his motion, argued that he was illegally seized and detained and that the two subsequent searches of his person and his vehicle were illegal. The state filed a response to appellant's motion on May 30, 2014.

{¶4}   On June 3, 2014, the trial court held an evidentiary hearing on the motion. At the conclusion of the hearing, the trial court denied the Motion to Suppress, stating its belief that the "officers acted appropriately and reasonably under the circumstances." No written findings of fact were filed. Nor was there an entry memorializing the court's decision.

{¶5}   On June 4, 2014, appellant pleaded no contest to possession of drugs (cocaine) in violation of R.C. 2925.11(A). The remaining count was dismissed. Pursuant to an Entry filed on August 29, 2014, appellant was sentenced to 11 months in prison.

{¶6}    Brandon appealed and this court remanded the case to the trial court to make findings of fact and conclusions of law based upon the evidence adduced at the suppression hearing.  *See, State v. Brandon*, 5th Dist. Muskingum No. CT2014-0039, 2015-Ohio-2072.

{¶7}    On July 2, 2015, the trial court filed findings of fact and conclusions of law in support of the denial of Brandon's motion to suppress.

{¶8}    Brandon filed a notice of appeal on Aug. 3, 2015.

*Assignments of Error*

{¶9}    Brandon raises three assignments of error,

{¶10}   "I. THE TRIAL COURT INCORRECTLY DENIED APPELLANT'S MOTION TO SUPPRESS EVIDENCE.

{¶11}   "II. THE TRIAL COURT'S FINDINGS OF FACT WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶12}   "III. THE TRIAL COURT APPLIED THE WRONG STANDARD WHEN DECIDING THE MOTION TO SUPPRESS AND ERRED AS A MATTER OF LAW."

*Analysis*

{¶13}   Brandon's three assignments of error relates to the propriety of the trial court's overruling of his motion to suppress. Subsumed within this generalized objection are three challenges to the trial court's ruling. Specifically, appellant contends that: (1) he was arrested without probable cause; (2) there was no reasonable suspicion to justify a *Terry* stop (3) no reasonable suspicion existed to justify a belief that Brandon was armed and dangerous.

**Standard of Review.**

{¶14}  Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 154-155, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate witness credibility. See *State v. Dunlap*, 73 Ohio St.3d 308,314, 1995-Ohio-243, 652 N.E.2d 988; *State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982). Accordingly, a reviewing court must defer to the trial court's factual findings if competent, credible evidence exists to support those findings. See *Burnside,* supra; *Dunlap,* supra; *State v. Long*, 127 Ohio App.3d 328, 332, 713 N.E.2d 1(4th Dist.1998); *State v. Medcalf*, 111 Ohio App.3d 142, 675 N.E.2d 1268 (4th Dist.1996). However, once this Court has accepted those facts as true, it must independently determine as a matter of law whether the trial court met the applicable legal standard. See *Burnside,* supra, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539(4th Dist 1997); See, generally, *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740(2002); *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911(1996). That is, the application of the law to the trial court's findings of fact is subject to a *de novo* standard of review *Ornelas*, supra. Moreover, due weight should be given "to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas*, supra at 698, 116 S.Ct. at 1663.

**Officers Encounter with Brandon.**

{¶15}  Contact between police officers and the public can be characterized in three different ways. *State v. Richardson*, 5th Dist. Stark No.2004CA00205, 2005–Ohio–554, ¶23–27. The first is contact initiated by a police officer for purposes of investigation.

"[M]erely approaching an individual on the street or in another public place [,]" seeking to ask questions for voluntary, uncoerced responses, does not violate the Fourth Amendment. *United States v. Flowers*, 909 F.2d 145, 147(6th Cir. 1990). The United States Supreme Court "[has] held repeatedly that mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *see also INS v. Delgado*, 466 U.S. 210, 212, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage." *Bostick,* 501 U.S. at 434–435, 111 S.Ct. 2382 (citations omitted). The person approached, however, need not answer any question put to him, and may continue on his way. *Florida v. Royer* (1983), 460 U.S. 491, 497–98. Moreover, he may not be detained even momentarily for his refusal to listen or answer. Id. "So long as a reasonable person would feel free 'to disregard the police and go about his business,' *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690 (1991), the encounter is consensual and no reasonable suspicion is required." *Bostick*, 501 U.S. at 434, 111 S.Ct. 2382, 115 L.Ed.2d 389.

{¶16}  The second type of contact is generally referred to as "a *Terry* stop" and is predicated upon reasonable suspicion. *Richardson, supra; Flowers*, 909 F.2d at 147; *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889(1968). This temporary detention, although a seizure, does not violate the Fourth Amendment. Under the *Terry* doctrine, "certain seizures are justifiable ... if there is articulable suspicion that a person has committed or is about to commit a crime" *Florida*, 460 U.S. at 498. In holding that

the police officer's actions were reasonable under the Fourth Amendment, Justice Rehnquist provided the following discussion of the holding in *Terry*,

> In *Terry* this Court recognized that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest. The Fourth Amendment does not require a police officer who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Adams v. Williams*, 407 U.S. 143, 145–47, 92 S.Ct. 1921, 1923–24, 32 L.Ed.2d 612(1972).

{¶17} The third type of contact arises when an officer has "probable cause to believe a crime has been committed and the person stopped committed it." *Richardson*, 2005-Ohio-554, ¶27; *Flowers*, 909 F.2d at 147. A warrantless arrest is constitutionally valid if: "[a]t the moment the arrest was made, the officers had probable cause to make it-whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the * * * [individual] had committed or was committing an offense." *State v. Heston*, 29 Ohio St.2d 152, 155–156, 280 N.E.2d 376(1972), *quoting Beck v.*

*Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142(1964). "The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 1661–1162(1996). A police officer may draw inferences based on his own experience in deciding whether probable cause exists. *See, e.g., United States v. Ortiz*, 422 U.S. 891, 897, 95 S.Ct. 2585, 2589(1975).

**{¶18}** The Ohio Supreme Court has held that a police officer's statement "Hey, come here a minute," while nominally couched in the form of a demand, is actually a request that a citizen is free to regard or to disregard. *State v. Smith*, 45 Ohio St.3d 255, 258–259, 544 N.E.2d 239, 242(1989), *reversed sub nom. Smith v. Ohio*, 494 U.S. 541, 110 S.Ct. 1288, 108 L.Ed.2d 464(1990); *State v. Crossen*, 5th Dist. Ashland No. 2010-COA-027, 2011-Ohio-2509, ¶13.

**{¶19}** In the case at bar, the officers did not stop the vehicle that Brandon was driving. The officers were in an unmarked, undercover vehicle that never activated lights or siren. The officers never motioned or otherwise requested Brandon to pull over or to stop the vehicle. Accordingly, the officers' approach and encounter with the stationary vehicle was consensual in nature, thereby making the Fourth Amendment inapplicable. The officers' request for appellee's identification was permissible. *INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 1762-1763, 80 L.Ed.2d 247. Neither officer ordered Brandon to get out of his car; rather, Brandon testified that he voluntarily got out of the car to speak to the officers. (T. at 48; 56).

**Terry pat-down protective search.**

{¶20} Authority to conduct a pat down search does not flow automatically from a lawful stop and a separate inquiry is required. *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Fourth Amendment requires an officer to have a "reasonable fear for his own or others' safety" before frisking. Id. Specifically, "[t]he officer ... must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" United *States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), *citing Terry, supra*, 392 U.S. at 27. Whether that standard is met must be determined from the standpoint of an objectively reasonable police officer, without reference to the actual motivations of the individual officers involved. *United States v. Hill,* 131 F.3d 1056, 1059 (D.C.Cir.1997), *citing Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

{¶21} In *State v. Lozada*, 92 Ohio St.3d 74, 2001–Ohio–149, 748 N.E.2d 520, the Ohio Supreme Court had the opportunity to discuss detentions and searches similar to the one in the case at bar. In *Lozada*, an Ohio State Trooper stopped a vehicle for speeding, and asked the driver to exit his vehicle. Even though the driver denied having any weapons, the trooper patted him down and found two small bags of cocaine.

{¶22} The Supreme Court found the initial traffic stop was proper, and the issue presented was whether it was reasonable to search the appellant for weapons and place him in a patrol car. The Supreme Court found whether an officer may pat a person down before placing him in a vehicle depends upon the legitimacy of placing him in the police car in the first place, *Lozada* at 523, *citing People v. Kinsella*, 139 A.D.2d 909, 527 N.Y.S.2d 899(1988). The *Lozada* court noted numerous courts have held an officer may

ask a driver to sit in his or her patrol car to facilitate the traffic stop, but the question of whether the driver may be searched for weapons before entering the patrol car is more problematic. In *Lozada*, the court found the placement of a driver in a patrol car during a routine traffic stop may be constitutionally permissible, but may not be used simply to justify a search of the driver. The intrusion of asking a driver to sit in a patrol car to facilitate a traffic stop may be relatively minimal, but the level of intrusion dramatically increases when the person is subject to a pat-down search for weapons before entering the patrol car. The Supreme Court found this violates the requirement of specific and articulable belief an individual is armed and dangerous first set forth in *Terry v. Ohio*, 392 U.S. 1, 88 Sup.Ct. 1868, 20 L.Ed.2d 889 (1969).

{¶23}  The *Lozada* court held it is unreasonable for an officer to search a driver for weapons before placing him or her in a patrol car if the sole reason for placing the driver in the patrol car during the investigation is for the convenience of the officer. The Supreme Court found, however, it is reasonable to place a driver in a patrol car and even subject him or her to a pat-down search for weapons where placement of the person in the patrol car is justified to protect the officer or the driver from dangerous conditions, *Lozada* at 525, citations omitted. The court gave the example of a hostile crowd threatening the officer and the driver, as an example of a dangerous condition necessitating the placement of the driver into the patrol car. Ultimately, the court concluded that no dangerous condition existed and that the state trooper's search of the defendant for weapons before placing him in the patrol car was unreasonable. Id. at 81. *Accord, State v. Scarbury*, Fifth Dist. Knox No. 03CA000016, 2003-Ohio-6483, ¶¶15-17.

{¶24}  In the case at bar, Detective Randy Wilson testified,

I remember Captain Welker asking Ronald if he would come to the office and speak to us, and he said he would; *although, he said he didn't want to ride down with us and he wanted to drive himself.* He wasn't given any sort of answer for that, whether that was going to be allowed or not. At that point we had not checked his driving status to see if it was valid, which would be something I would do. If I'm going to allow somebody to drive a vehicle back to our office once I'm out with them I'm going to make sure they're valid.

So at that point Captain Welker started to check the interior of the vehicle, told him he was going to check the interior of the vehicle for weapons. Ronald stepped away from the door. We were backed up a few steps. And I asked Ronald if he had anything on his person and told him that I was going to pat him down. *And the reason for that was if we were going to transport him down there I was going to be concerned for my safety if he's going to get in one of our vehicles.* I wanted to make sure he didn't have any weapons. And the way he was acting I was concerned that he -- he may have a weapon on him.

Q.     *Did his reluctance to accept your offer to drive him down, did that raise any particular red flags?*

A.     *Yes.*

Q.     *In -- in what way?*

A.     *Why wouldn't he ride down with us.* [sic.] *You know, we hadn't -- we didn't tell him he was under arrest for anything. You know, we merely*

*wanted to speak to him about the missing juvenile.* And I had asked him if he was living at that location, which he denied. But any time I get a complaint on one of these sex offenders, you know, just because they tell me, no, I'm not staying there, I don't just walk away from it. At that point I want to sit down with them in depth and speak to them about it.

Q.    Okay. But as far as him not wanting to get in your car, did that cause you to believe he may have contraband or a weapon on his person?

A.    Yes.

Q.    And so at that point you say that you asked -- or told him that you were going to pat him down?

A.    Yes.

Q.    All right. And your reason for doing that was what?

A.    Officer safety.

T. at 36-38. (Emphasis added). Detective Captain Steve Welker testified,

Q.    And then you said to him [Brandon], come downtown and make a statement?

A.    I don't remember that.

Q.    But –

A.    We -- we could have discussed that. *I honestly don't remember.* By this time I believe Detective Wilson was there, and he and -- and Ron were talking then. By that time I think I was looking in the car.

* * *

Q.    All right. You don't remember but you may have told him [Brandon] I want you to come downtown and make a statement?

A.    That's not something I would say. I might ask him to come downtown -- to start with, we weren't downtown anyway, so I'm sure I wouldn't have said downtown.

Q.    Okay.

A.    Secondly, I would never say come downtown to make a statement. That's not how I would say it. I would say, would you come to the office and talk to us. I might have said something like that.

Q.    Okay. And -- and Mr. Brandon said yes?

A.    *I don't remember if we even had that conversation for sure.*

T. at 26-27. (Emphasis added).

There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments. *Dunaway*, [442 U.S.] at 212 [2256]; *Florida v. Royer*, 460 U.S. 491, 499 [103 S.Ct. 1319, 1325, 75 L.Ed.2d 229] (1983) (plurality opinion). And our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision,

are sufficiently like arrests to invoke the traditional rule that arrests may

constitutionally be made only on probable cause.

*Hayes v. Florida*, 470 U.S. 811, 815–16, 105 S.Ct. 1643, 1646–47, 84 L.Ed.2d 705 (1985)

(footnote omitted).

**{¶25}** In the case at bar, both officers concede that Brandon was not under arrest when asked by the officers to come down to the office and make a statement. It is further clear that Detective Wilson corroborated Brandon's testimony that Brandon declined the officers' invitation to ride to the office in the unmarked police car; rather Brandon told the officers that he would drive his own vehicle voluntarily to the office to answer any further questions the officers might have for him. It is also evident that the officers had no legitimate reason for placing Brandon in the unmarked police car and transporting him to the office for questioning. Detective Captain Welker had found no weapon inside Brandon's vehicle prior to the request. Brandon and the officers were in close proximity while Brandon answered the questions the officers posed to him, without having been patted down for weapons. It was daytime on a public street. The officers did not express any reasonable, articulable suspicion that Brandon was armed. Brandon never consented to the search of his car or his person.

**{¶26}** We conclude the officers did not provide sufficient reasons to justify a reasonable belief Brandon was armed and presently dangerous. Accordingly, the pat down search of Brandon was illegal. Further, it was unreasonable for the officers to conduct a pat down search of Brandon before placing Brandon in the unmarked police car and transporting him to the office for questioning.

{¶27} The judgment of the Muskingum County Court of Common Pleas is reversed, and this case is remanded to that Court for proceedings in accordance with our opinion and the law.

Gwin, J.,

Farmer, P.J., and

Hoffman, J., concur